# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PAUL PANASUK,**

　　　　　　**Plaintiff,**

　　**v.**　　　　　　　　　　　　　　　　**Case No. 07-C-28**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
　　　　　　**Defendant.**

---

## DECISION AND ORDER

　　　　Plaintiff Paul Panasuk suffers from muscular dystrophy ("MD"), heart problems and mental impairments including depression and a learning disability. Claiming that these conditions rendered him unable to work, he applied for social security disability benefits. The Social Security Administration ("SSA") denied his application, as did an Administrative Law Judge ("ALJ") after a hearing. The Appeals Council then denied his request for review, making the ALJ's decision final. See Schmidt v. Astrue, No. 06-3930, 2007 U.S. App. LEXIS 18764, at *20 (7th Cir. Aug. 8, 2007) ("Where, as here, the Appeals Council has declined to review the ALJ's decision, the ALJ's decision constitutes the final decision of the Commissioner."). Plaintiff now seeks judicial review of the ALJ's decision, as permitted by 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A.　　Judicial Review

　　　　The court's task on judicial review is limited to determining whether the ALJ's decision is "supported by substantial evidence and based on the proper legal criteria." Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004) (internal quote marks omitted). Substantial

evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). The reviewing court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004). However, the ALJ's decision must demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. While the ALJ need not evaluate in writing every piece of evidence, his decision must be sufficient to assure the court that he considered the important evidence. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996). Even if the evidence in the record supports the decision, the court cannot uphold it if the ALJ failed to build an accurate and logical bridge between the evidence and the result. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). Likewise, if the ALJ commits an error of law, the court "may reverse without regard to the volume of evidence in support of the factual findings." White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999).

**B.    Disability Standard**

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently engaged in substantial gainful activity[1]; (2) if not, whether the claimant has a severe impairment

---

[1]"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit. 20 C.F.R. § 404.1572.

2

or combination of impairments;[2] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[3] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[4] and (5) if not, whether the claimant is able to perform any other work. Skinner v. Astrue, 478 F.3d 836, 844 n.1 (7th Cir. 2007).

The claimant carries the burden of proof at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid and must consult a VE if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work. E.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

---

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[3]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

[4]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

3

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application

Plaintiff applied for benefits on April 9, 2003, alleging a disability onset date of September 15, 2000.[5] (Tr. at 68; 419.) He stated that he could not work due to fatigue and weakness stemming from his MD, as well as trouble acquiring skills due to his learning disability. He indicated that he had trouble walking, going up stairs and standing for long periods, and experienced shortness of breath and heart racing with exertion. Plaintiff wrote that on a typical day he slept, worked part-time when scheduled, spent time with friends and played computer games. (Tr. at 107.) He stated that he was able to drive, cook and care for himself, but infrequently did other work around the house. (Tr. at 110.)

Concerning his previous employment, plaintiff indicated that he had worked part-time as a car washer, stock boy, car porter and cashier. (Tr. at 119; 129-33; 152-55.) He stated that he graduated high school, where he attended special education classes based on attention deficit disorder ("ADD") and a learning disability, but completed no additional education. (Tr. at 124; see also 259-302.)

The SSA determined that plaintiff was not disabled by these impairments and denied his application initially (Tr. at 41; 43) and on a request for reconsideration (Tr. at 42; 48). Plaintiff then asked for a hearing before an ALJ, and on May 11, 2006, he appeared with counsel before ALJ Robert White. (Tr. at 432.)

---

[5]At the hearing, plaintiff's counsel suggested an onset of February 2004, at which point plaintiff's muscular and cardiac conditions began to deteriorate. (Tr. at 473-75.) In his decision, the ALJ agreed to consider this amended onset date. (Tr. at 12.)

4

**B.    Hearing Testimony**

   **1.    Plaintiff's Testimony**

At the hearing, plaintiff testified that he was twenty-three years old and lived with his aunt.  (Tr. at 436-37.)  He stated that he was staying with his aunt because his parents had kicked him out of their house for failing to follow the rules and get a job.  (Tr. at 453; 456.)  He indicated that he helped his aunt paint and mow the lawn at the apartment building she managed.  (Tr. at 454-55.)  He testified that he was also working about eighteen hours per week making sandwiches at a sub shop.  (Tr. at 440.)  He indicated that his employer accommodated him at this job, as he was allowed to sit on a stool while he worked and all the ingredients were placed in front of him.  He was not required to carry boxes or re-stock ingredients.  (Tr. at 444.)  Plaintiff testified that he had missed two days of work that month due to fatigue from his MD and sleep apnea, and illness.  (Tr. at 441.)

Plaintiff testified that his MD slowed him down, weakened his legs and caused him to fall two to three times per day.  He indicated that he could not walk long distances or carry anything heavy.  (Tr. at 447-48.)  He also indicated that the MD was starting to make his hands weaker and that his arms and legs twitched.  (Tr. at 449-50.)  As far as his daily activities, plaintiff testified that besides eating, sleeping and watching TV, he used the computer and played video games.  (Tr. at 452.)  He stated that he did not cook or clean (Tr. at 453), and his aunt did his laundry (Tr. at 455).

   **2.    VE's Testimony**

The VE, Robert Neuman, testified that plaintiff's current and previous part-time work did not qualify as substantial gainful activity.  (Tr. at 440; 462.)  Thus, the ALJ did not inquire as

to plaintiff's ability to perform his past work. The ALJ proceeded to ask the VE a hypothetical question about the availability of other jobs for a person of plaintiff's age and education, limited to unskilled, sedentary work with the ability to stand five to ten minutes every hour, with no climbing and only occasional postural movements. The VE stated that such a person could work as a production inspector, hand packer or information clerk/telephone interviewer. (Tr. at 462.)

## C.   Medical Evidence

### 1.   Treatment Records

On July 31, 2001, plaintiff saw Dr. Wendy Peltier, a neurologist, regarding his MD. She indicated that plaintiff had been diagnosed with Becker's dystrophy as a child but experienced few neuromuscular symptoms, aside from some problems with running and exertional fatigue. He was able to play high school football and did fairly well. Plaintiff's mother reported no significant decline in strength, but she did notice some slowness in running and weakness climbing stairs. Plaintiff took only over-the-counter medicines for his condition. (Tr. at 169.) On exam, Dr. Peltier found plaintiff to have normal muscle strength except for trace weakness of the hip flexors. He was able to do a deep knee bend with minimal arm push. His deep tendon reflexes were intact but somewhat diminished at the ankles. His casual gait was steady, but he did exhibit a waddling gate when running. Dr. Peltier's impression was that plaintiff was only mildly affected by his MD. She recommended that he try creatine monohydrate for some of his exertional fatigue. (Tr. at 170.) Dr. Peltier referred plaintiff for cardiac testing in September 2001, which revealed a borderline enlarged left ventricle with mild systolic dysfunction. (Tr. at 95; 168; 226.)

6

In the spring of 2002, following his graduation from high school, plaintiff started working with Curative Care Network and the state Department of Vocational Rehabilitation ("DVR") in an attempt to find work. He completed a work training program (Tr. at 100; 102; 317-18; 324-28; 341-44; 346-49; 351-64), and his placement specialist opined that he was capable of successful employment in the community, but recommended part-time, sedentary work allowing for some degree of movement and job coaching. (Tr. at 103-04.) Dr. Peltier also prepared a functional capacity evaluation for the DVR, estimating that in an eight hour day plaintiff could continuously sit four hours, stand four hours with rest, and walk three hours with rest. She further estimated that he could lift and carry up to fifty pounds continuously and up to 100 pounds frequently, frequently engage in postural movements such as bending, squatting, crawling and climbing, and had no limitation in his ability to repetitively use his feet and hands. She indicated that plaintiff's condition could progressively worsen over time but was currently stable. She stated that he could work full-time. (Tr. at 93-94.)

On April 18, 2002, plaintiff elected to leave the DVR program, for reasons his placement specialist found "unclear." (Tr. at 100; 233; 340.) However, a week later plaintiff found a job with Best Ford as a lot attendant. (Tr. at 98.) After initially doing well, Best laid plaintiff off, and in June and July 2002, he requested additional DVR assistance in developing a plan to become a truck driver. (Tr. at 329-39.)

On September 5, 2002, plaintiff returned to Dr. Peltier, reporting that he had been unable to find another job. Plaintiff's mother stated that he was having anger and impulse control issues and drinking too much. Plaintiff reported no significant change in his physical abilities and stated that if anything he felt stronger after doing a weight and exercise program. He also reported taking karate classes and earning a black belt. (Tr. at 166.) Plaintiff stated

7

that he wanted to become a truck driver but had trouble passing the written exam required for certification. (Tr. at 166-67.) On exam, Dr. Peltier found that plaintiff had fairly intact muscle strength, with mild calf hypertrophy and diminished deep tendon reflexes in the legs. However, she believed that plaintiff may be experiencing a reactive depression, provided a sample of Celexa and suggested that he follow up with a neuro-psychologist. Dr. Peltier concluded that plaintiff was "more disabled functionally than his dystrophy has produced likely due to the psychosocial stressors and depression." (Tr. at 167.)

In December 2002, plaintiff saw psychologist Randall Daut, Ph.D., reporting conflicts with his parents, difficulty holding jobs, recent deaths of relatives and problems with various friends. On examination, Dr. Daut found plaintiff cooperative but with dysphoric mood. (Tr. at 174-75.) Dr. Daut diagnosed depression, not otherwise specified, learning disability, possible attention deficit disorder by history, and alcohol abuse. Dr. Daut planned to see plaintiff again but doubted how motivated plaintiff was to make changes in his life. Dr. Daut encouraged plaintiff to take the medication Dr. Peltier prescribed. (Tr. at 174.) Plaintiff did not follow through on treatment with Dr. Daut. (Tr. at 172-73.)

On February 3, 2004, plaintiff returned to Dr. Peltier, complaining of knee pain, weakness in his gait and shortness of breath when climbing stairs. On exam, Dr. Peltier noticed plaintiff to have a slightly waddling gait, and she suspected that his shortness of breath was related to his worsening cardiac condition (Tr. at 245-46.) She obtained a right knee x-ray, which revealed no fracture or loose bodies but limited joint effusion. (Tr. at 225.) She also ordered follow up cardiac testing in March 2004, which revealed an estimated LVEF (left-ventricular ejection fraction) of 35-40% and trace mitral regurgitation. (Tr. at 223-24.)

On October 18, 2005, plaintiff returned to Dr. Peltier, complaining of progressing

8

weakness to the point where he was having trouble negotiating stairs. He also continued to experience psycho-social stressors and was in a reactive depression from coping with his disease. Plaintiff stated that he was about to start working for a company changing tires, which he believed he could do physically. He was taking no medications but requested samples of anti-depressants, which had helped him in the past. On exam, Dr. Peltier noticed significant calf hypertrophy and significant weakness of hip flexion. (Tr. at 243.) His casual gait was slightly waddling. Dr. Peltier's impression was that plaintiff was experiencing the slow progression characteristic of his disease, along with a depression that may be "more disabling than his muscle disease in itself." (Tr. at 244.) Dr. Peltier opined that plaintiff "certainly would not be able to tolerate physical demands by his previous employment, but I think he is a candidate for some form of light duty as he is still ambulatory." (Tr. at 244.) She discussed with plaintiff his pending social security application and told him that he would likely need a functional capacity evaluation to qualify for complete disability. She gave plaintiff samples of Lexapro for his depression. (Tr. at 244.)

On November 28, 2005, plaintiff underwent a functional capacity evaluation ("FCE") on referral from Dr. Peltier. The FCE revealed that plaintiff could sit for sixty minutes in a padded chair, stand for fifteen minutes, and lift fifty-five pounds from the floor bilaterally. However, he was unable to lift fifteen pounds in a sustained fashion for any length of time and was at risk of falling with unilateral lifting or carrying. Plaintiff was also unable to ascend/descend twelve stairs or climb a ladder without risk of falling. Nor could he kneel or hold a sustained squat. (Tr. at 234.) The therapists recommended that plaintiff avoid bending and twisting, no stair climbing or bilateral lifting over five pounds, limited standing and walking due to the risk of falling, frequent rest breaks, no ladder climbing, and avoidance of kneeling, squatting and lifting

9

from the floor.  Plaintiff's performance demonstrated his ability for less than a sedentary category of work.  (Tr. at 235.)  The therapists further noted that plaintiff's condition was progressive, and his present level of functioning would be his highest.  (Tr. at 236.)  The therapists noted no limitations in reaching and grasping, although his right hand grip strength was slightly below normal.  (Tr. at 237-38.)  The therapists indicated that plaintiff put forth a maximum effort on testing, and his performance worsened as the exam progressed due to fatigue and shortness of breath.  (Tr. at 241.)

In December 2005, plaintiff's new primary care physician, Dr. Kevin Izard, referred plaintiff for physical therapy to increase his strength and reduce falls.  (Tr. at 227; 395-405.) Plaintiff reported falling about five times per day and had recently obtained a cane.  (Tr. at 230.)  In January 2006, plaintiff reported that the cane was helping with his falls.  (Tr. at 395.)

On January 6, 2006, Dr. Izard prepared a report in which he expressed no opinion on plaintiff's exertional (e.g., lifting, standing, walking, sitting) or postural (e.g., bending, crouching, climbing) abilities, but opined that plaintiff needed the opportunity to shift positions from seated to standing at will and would need to lie down at unpredictable intervals during a work shift.  (Tr. at 254-55.)  He stated that plaintiff had difficulty with stairs but his gait was otherwise steady. He found no limitations with plaintiff's use of the hands, nor did he find any environmental restrictions.  (Tr. at 257.)  He anticipated that plaintiff would be absent more than three times per month based on his impairments.  (Tr. at 258.)  As supportive medical findings, Dr. Izzard listed lower extremity muscle weakness and knees that often gave out.  (Tr. at 255.)  However, he noted no abnormal motor loss, reflex findings or sensory findings.  (Tr. at 256.)

On January 18, 2006, Dr. Izard arranged further cardiac testing, which revealed a moderately enlarged left ventricle with moderate systolic dysfunction.  The physician noted that

10

plaintiff's condition had worsened since the previous testing in March 2004. (Tr. at 375-76.) On January 30, 2006, Dr. Izard referred plaintiff for a polysomnography, which revealed mild to moderate obstructive sleep apnea. The consulting physician recommended nocturnal ventilation treatment. (Tr. at 366-67.)

Finally, on March 17, 2006, plaintiff underwent a psychological evaluation arranged by his social security lawyer with Mark Rusch, Ph.D. On testing, plaintiff put forth above average effort and his attention and concentration were adequate. At one point, he stated that he hoped the tests would turn up something so he could get some "free money."[6] (Tr. at 407.) Dr. Rusch assessed plaintiff in the average range of intellectual and memory functioning (Tr. at 408-10), but with very low reading, math and spelling scores (Tr. at 411). On personality testing, Dr. Rusch found plaintiff's profile indicative of a "naive exaggeration of symptoms." (Tr. at 411.) Dr. Rusch concluded that plaintiff did not experience significant impairment of the cognitive and personality functions required for successful vocational adaptation and assessed a GAF (Global Assessment of Functioning) of 75 (Tr. at 413), indicative of no more than slight impairment in occupational functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).

### 2. SSA Consultants' Reports

The SSA also arranged for plaintiff's claim to be evaluated by several consultants. On May 6, 2003, plaintiff underwent a consultative neurology exam with Dr. Daryl Melzer. Plaintiff reported being diagnosed with MD as a boy but suffering no real symptoms until age sixteen or seventeen, when he began experiencing progressive weakness in the legs. He stated that

---

[6]At the hearing, plaintiff explained that he was being a smart aleck when he made this remark. (Tr. at 446.)

11

he got tired walking stairs and at times his knees buckled, but he denied upper extremity weakness.  (Tr. at 177.)  On exam, Dr. Melzer found plaintiff's motor function to be relatively normal but with pseudo-hypertrophy of the calves.  (Tr. at 178.)  Plaintiff's gait was stable, and he was able to walk on his toes and heels.  However, he could not squat beyond fifteen degrees and still get back to a standing position.  Dr. Melzer noted that MD is a progressive illness, but plaintiff's functioning was at the time "reasonably good."  (Tr. at 179.)

On May 9, 2003, plaintiff underwent a psychological consultative exam with Darrell Hischke, Ph.D., reporting depression and suicidal ideation, but with no intent or plan to actually kill himself.  (Tr. at 180.)  On mental status exam, Dr. Hischke found plaintiff well groomed, pleasant and cooperative.  (Tr. at 181.)  His affect was generally euthymic, and he reported feeling "tired and happy."  (Tr. at 182.)  He demonstrated no evidence of a thought disorder, was oriented, and had no difficulty following the conversation.  Plaintiff reported engaging in leisure activities with friends and was able to care for himself, although his parents supported him financially.  (Tr. at 182.)  On testing, plaintiff was found to be in the low average range of intellectual functioning.  (Tr. at 183-84.)  Dr. Hischke found no evidence of attention deficit disorder but did see evidence of mild depression based on excessive sleeping.  Dr. Hischke opined that plaintiff was only mildly limited in his ability to understand, remember and carry out instructions; sustain concentration, persistence and pace; relate to supervisors and co-workers; and cope with routine work stress.  (Tr. at 184-85.)

On May 21, 2003, Anthony Matkom, Ph.D, completed a psychiatric review technique form for the SSA, evaluating plaintiff under Listings 12.02, Organic Mental Disorders, and 12.04, Affective Disorders.  (Tr. at 208.)  Dr. Matkom concluded that plaintiff had no restrictions in activities of daily living or social functioning, and no episodes of decompensation, but had

12

moderate difficulty maintaining concentration, persistence and pace. (Tr. at 218.) In a mental RFC report, Dr. Matkom found no significant limitations in most areas of understanding, concentration, social interaction and adaptation, with moderate limitations in a few areas. (Tr. at 204-05.) On July 10, 2003, Dr. Rattan reviewed and affirmed these assessments. (Tr. at 206; 208.)

On May 22, 2003, Dr. Pat Chan reviewed plaintiff's file and completed a physical RFC assessment, concluding that plaintiff retained the exertional ability for light work (i.e., lifting up to twenty pounds occasionally, ten pounds frequently, and standing/walking six out of eight hours) with no postural, manipulative or other limitations. (Tr. at 196-203.) Dr. Robert Callear reviewed and affirmed this assessment on July 9, 2003. (Tr. at 203.)

**D.     ALJ's Decision**

On June 21, 2006, the ALJ issued an unfavorable decision. The ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged disability onset date and suffered from severe impairments – muscular dystrophy, slow heart functioning, a learning disability and depression – none of which met or equaled a Listing. (Tr. at 15-17.) At step four, the ALJ concluded that plaintiff retained the RFC for a reduced range of sedentary, unskilled work. (Tr. at 17.) In so finding, the ALJ concluded that plaintiff's testimony as to the severity of his symptoms was no more than partially credible. (Tr. at 18.) Because none of plaintiff's previous jobs rose to the level of substantial gainful activity, the ALJ proceeded to step five, where, relying on the testimony of the VE, he concluded that plaintiff could perform other jobs in the national economy such as inspector, hand packager and information clerk. (Tr. at 20.) Accordingly, the ALJ found plaintiff not disabled and denied his claim. (Tr. at 21.)

Plaintiff sought review by the Appeal Council (Tr. at 427-31), but on November 9, 2006,

the Council denied the request (Tr. at 6).  The present action followed.

## III.  DISCUSSION

Plaintiff argues that the ALJ (1) failed to consider the limitations set forth in the November 28, 2005 FCE in determining RFC, (2) improperly rejected Dr. Izard's January 6, 2006 report, (3) failed to consider the effects of his mental impairments or to include all such limitations in his questions to the VE, and (4) erred in evaluating the credibility of his testimony. I address each argument in turn.

## A.  RFC

Plaintiff first argues that the ALJ failed to consider all of the important evidence in setting RFC.  RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant.  Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling.  Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities.  The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  The ALJ must also explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. Patterson v. Barnhart, 428 F. Supp. 2d 869, 885-86 (E.D. Wis. 2006) (citing SSR 96-8p).

14

In the present case, the ALJ concluded that plaintiff retained the physical RFC for sedentary work allowing standing every five to ten minutes each hour, no climbing of ladders, ropes or scaffolds, occasional climbing of stairs and ramps, and occasional balancing, stooping, kneeling, crouching and crawling. As to his mental RFC, the ALJ concluded that plaintiff could perform simple, routine, repetitive, unskilled work. (Tr. at 17.) In so finding, the ALJ relied on Dr. Peltier's records, Dr. Rusch's report, the SSA consultants' opinions, plaintiff's daily activities and the limited treatment plaintiff received for his conditions, particularly his mental impairments. (Tr. at 17-19.)

Although the ALJ provided a fairly detailed discussion of the evidence supporting his conclusion, he failed to specifically discuss the FCE completed on November 28, 2005. (Tr. at 234-41.) The ALJ included the exhibit number (12-F) corresponding to this report in a string cite of exhibits he said supported his physical RFC finding, but, as the Commissioner now concedes, the FCE suggests greater limitations than the ALJ adopted. Contrary to SSR 96-8p, the ALJ failed to resolve or even acknowledge this inconsistency in the record. See Wates v. Barnhart, 274 F. Supp. 2d 1024, 1034-45 (E.D. Wis. 2003) (reversing where the ALJ claimed to give significant weight to a report which actually contradicted his RFC determination and failed to notice the conflict).

The Commissioner argues that the ALJ was not required to give controlling or even significant weight to this report, which was prepared by physical therapists, who do not qualify as "acceptable medical sources" in social security cases. See 20 C.F.R. § 404.1513(a)(1). However, the Seventh Circuit has held that "such reports are entitled to consideration." Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004); see also SSR 06-03p (stating that, depending on the particular facts in a case, an opinion from a medical source who is not an "acceptable

15

medical source," such as a therapist, may outweigh the opinion of an "acceptable medical source," including a treating source). As the Barrett court noted, physical therapists have "significant expertise" in dealing with chronic or progressive conditions, 355 F.3d at 1068, like plaintiff's MD. Further, as in Barrett, the therapists in plaintiff's case based their "evaluation on physical tests and observation," id. at 1067, not just on what plaintiff told them. Thus, even though the ALJ found plaintiff's subjective complaints less than credible, that finding does not weaken the therapists' conclusions.

The Commissioner also argues that the objective findings obtained during the FCE – that plaintiff had normal strength, full range of motion and intact sensation – fail to support the limitations the therapists recommended. The Commissioner cites no medical evidence supporting this assertion, but even assuming some contradiction in the FCE report, the problem with the Commissioner's argument is that the ALJ did not make it. Principles of administrative law require the ALJ to rationally articulate the grounds for his decision and limit the court's review to the reasons he supplied. "That is why the ALJ (not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to her conclusion.'" Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002) (quoting Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001)).

Finally, I cannot conclude that the ALJ's failure to consider this piece of evidence was harmless, as the VE testified that acceptance of the limitations contained therein would preclude all full-time work. (Tr. at 465.)[7] Therefore, the matter must be remanded for

_____

[7]At the hearing, the ALJ expressed some skepticism about the FCE. (Tr. at 464-65.) However, these comments during the hearing cannot take the place of reasoned analysis in the written decision. Further, although the ALJ also expressed some doubts about the credibility of plaintiff's claims at the conclusion of the hearing, he did indicate that he would give

16

consideration of the November 28, 2005 FCE.

**B.    Dr. Izard's Treating Source Report**

Plaintiff next argues that the ALJ erred in rejecting the January 6, 2006 report of his treating physician, Dr. Izard.  Treating source opinions are entitled to special consideration in social security cases.  Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001).  If such opinion is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" and "'not inconsistent' with the other 'substantial evidence' in the individual's case record," the ALJ must afford it "controlling weight."  SSR 96-2p.  Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply reject it.  SSR 96-2p.  Rather, he must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist.  20 C.F.R. § 404.1527(d).

In the present case, the ALJ concluded that Dr. Izard's report was entitled to no "persuasive weight."  (Tr. at 19.)  The ALJ first noted that Dr. Izard rendered no opinion at all on plaintiff's exertional or postural abilities.  The doctor did opine that plaintiff would have to lie down at unpredictable intervals and would be absent more than three times per month.  However, the ALJ concluded that these restrictions were contrary to Dr. Izard's objective findings of no abnormal motor loss, no reflex problems and no sensory problems.  The ALJ

_____

serious consideration to granting plaintiff's application based on plaintiff's inability to sustain work effort.  (Tr. at 471.)  The FCE includes information on plaintiff's ability to sustain effort.  (Tr. at 235, 241.)  Finally, no doctor criticized or rejected the FCE, which was ordered by plaintiff's treating neurologist, Dr. Peltier, and cited by plaintiff's treating general practitioner, Dr. Izard, in his January 6, 2006 report.

17

further stated that Dr. Izard's conclusions "were not well-supported by the majority of the other substantial medical evidence in the record" and were "contrary to the other medical evidence in the record." (Tr. at 19.)

Regarding Dr. Izard's failure to address exertional and postural abilities, plaintiff notes that the doctor did reference the recently conducted FCE in his report. (Tr. at 256, 258.) However, Dr. Izard did not specifically adopt any of the opinions in that evaluation, nor did he refer to it in connection with the exertional or postural abilities he declined to address. Thus, it was reasonable for the ALJ to criticize the report for its omission of any discussion of plaintiff's exertional and postural abilities.

As SSR 96-2p makes clear, "It is not unusual for a single treating source to provide medical opinions about several issues[.] Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source." Consistent with this directive, the ALJ considered Dr. Izard's opinion on plaintiff's fatigue and attendance, but the language the ALJ used in rejecting these opinions is problematic. As noted, the ALJ indicated that the report was not "well-supported by the majority of the other substantial medical evidence" and was "contrary to the other medical evidence." (Tr. at 19.) But SSR 96-2p requires the ALJ to give controlling weight to a report which is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" and "'not inconsistent' with the other 'substantial evidence' in the individual's case record." As I explained in Dominguese,

> the ALJ must give controlling weight to the treating source's opinion if it is "not inconsistent" with other substantial evidence in the record; the opinion need not . . . be "consistent" with the record. This is not merely a semantic issue. The "not inconsistent" standard presumes the opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the treating

18

source's opinion less than controlling weight. Under the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it.

172 F. Supp. 2d at 1100 (citation omitted). Thus, in the present case, the ALJ applied a standard contrary to SSR 96-2p.

However, the ALJ also noted the absence of any objective findings in the report supporting Dr. Izard's restrictions. Indeed, Dr. Izard provided little more than notations of "generalized weakness" and "mild thigh muscle atrophy" in support. (Tr. at 256.) As the ALJ also noted, Dr. Izard found nothing abnormal in plaintiff's motor, reflex and sensory functioning. (Tr. at 256.) The ALJ may reject a treating source report if the doctor provides no objective medical basis for his opinion, see, e.g., Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004), or if the report is internally inconsistent, see, e.g., Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995); see also Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001) ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations."). Further, as the Commissioner notes, the record contains no treatment notes from Dr. Izard supporting these restrictions; nor is there any indication of the length of the treatment relationship between Dr. Izard and plaintiff.

Given the additional reasons provided by the ALJ, I might be inclined to find his violation of SSR 96-2p harmless. See Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision."). However, because the error is not clearly harmless and because the matter must be remanded anyway, I will also remand on this ground.

19

**C.     Mental Impairments**

Next, plaintiff alleges that the ALJ failed to take into account the effects of his mental

impairments, both in setting RFC and in questioning the VE.

**1.     Mental RFC**

> Disability claims based on mental disorders are evaluated in essentially the same
> manner as claims based on physical impairments. If the mental impairment is
> severe, the ALJ must determine whether it meets or equals any of the Listings.
> The Listings of mental impairments typically consist of three sets of "criteria": the
> paragraph A criteria (a set of medical findings), paragraph B criteria (a set of
> impairment-related functional limitations), and paragraph C criteria (additional
> functional criteria applicable to certain Listings).   The paragraph A criteria
> substantiate medically the presence of a particular mental disorder.  The criteria
> in paragraphs B and C describe the impairment-related functional limitations that
> are incompatible with the ability to perform substantial gainful activity (SGA).

Wates, 274 F. Supp. 2d at 1036.  There are four broad areas in which the SSA rates the

degree of functional limitation: (1) activities of daily living ("ADLs"); (2) social functioning; (3)

concentration, persistence or pace; and (4) episodes of decompensation.  20 C.F.R. §

404.1520a(c)(3).   The SSA rates the degree of limitation in the first three areas using a

five-point scale: none, mild, moderate, marked and extreme.  The degree of limitation in the

fourth area is evaluated using a four-point scale: none, one or two, three, and four or more.

The last point on each scale represents a degree of limitation that is incompatible with the

ability to do any gainful activity.  § 404.1520a(c)(4).  Certain Listings may also be met if the

claimant has marked limitations in two areas.  See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 12.04(B).

In the present case, the ALJ concluded that plaintiff was no more than moderately

limited under the B criteria and thus did not meet any of the Listings of mental impairments (Tr.

at 17; 19), a finding plaintiff does not challenge here.  However, the regulations require the ALJ

20

to also consider whether the claimant retains the mental RFC to perform SGA, even if he does not meet a Listing. The mental RFC assessment complements the functional evaluation necessary for paragraphs B and C of the Listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders. Wates, 274 F. Supp. 2d at 1037. Those capacities include the ability the ability to (1) understand, remember and carry out simple instructions; (2) make simple work-related decisions; (3) respond appropriately to supervision, coworkers and customary work pressures in a work setting; and (4) deal with routine changes in work settings. Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1035 (E.D. Wis. 2004).

Plaintiff notes that the ALJ found his depression and learning disability severe and restricted him to simple, unskilled work, yet failed to explain the basis for this conclusion. However, the ALJ provided ample basis for his finding. He noted that examining consultant Dr. Hischke found only mild limitations in plaintiff's ability to understand, remember and carry out instructions, sustain concentration and pace, relate to supervisors and co-workers, and cope with routine stress and change. (Tr. at 18; 184.) The ALJ further cited the report of plaintiff's consulting psychologist, Dr. Rusch, who likewise found only slight impairment in functioning. (Tr. at 18; 413.) The ALJ noted that plaintiff saw a psychologist, Dr. Daut, who diagnosed depression, learning disability and possible ADD, but Dr. Daut noted no significant limitation in functioning based on these conditions. (Tr. at 18; 174-75.) Otherwise, the ALJ noted, plaintiff had received little or very infrequent mental health treatment, and no doctor opined that he was disabled based on mental impairments. (Tr. at 18.)

Plaintiff points to Dr. Peltier's observation that he may be more disabled by depression than by his MD, and her provision of medications. However, the ALJ was not required to

21

conclude that plaintiff had any specific work limitations based on this evidence. Nor did the ALJ err in relying on the opinions of the mental health experts on this issue, rather than Dr. Peltier, a neurologist. See Schmidt v. Apfel, 201 F.3d 970, 973 (7th Cir. 2000) ("The ALJ is under no duty to respect expert opinions that are given outside a witness' field of expertise.").

Plaintiff faults the ALJ for relying on his limited treatment, without citing any medical evidence as to what sort of treatment he should have been receiving. See Brown v. Barnhart, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (noting that while the ALJ properly considered the claimant's conservative treatment, he failed to explain "what sort of treatment [the claimant] should have been pursuing" or "to consider any reasons for [the claimant's] lack of treatment"). However, the ALJ concluded that plaintiff had received little mental health treatment because he did not seek it (Tr. at 18); as the Commissioner notes, plaintiff was able and willing to seek treatment for his physical problems when necessary. Further, aside from brief references in Dr. Rusch's report that plaintiff "may resist" psychotherapy (Tr. at 413) and in Dr. Daut's notes that plaintiff lacked motivation "to make some changes in his life" (Tr. at 174), plaintiff cites no evidence suggesting that his limited treatment was based on anything more than the fact that he did not really need more.[8]

In any event, plaintiff points to no evidence supporting greater restrictions based on his mental impairments. Therefore, for all of these reasons, plaintiff has failed to demonstrate harmful error in the ALJ's mental RFC determination.

─────────────────────

[8]Plaintiff contends that the ALJ improperly attributed his depression solely to family problems, drinking and lack of employment. The ALJ made no such finding; rather, he noted that the treatment records of Dr. Daut recorded such problems (Tr. at 18), which they did (Tr. at 174-75). Dr. Peltier stated that plaintiff's depression was based on his MD "and other psychosocial stressors." (Tr. at 244.)

22

### 2. VE Questions

Plaintiff also faults the ALJ for not including all of the mental limitations from the RFC in his questions to the VE. As noted, the ALJ limited plaintiff to "simple, routine, repetitive, unskilled work." (Tr. at 17.) However, in his questions to the VE, the ALJ mentioned only "unskilled" work, omitting the other qualifiers. (Tr. at 462.)

Where, as here, the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). The Commissioner acknowledges the ALJ's oversight in the present case, but argues that the error was harmless because all of the jobs identified by the VE were simple, unskilled jobs requiring very little time to learn.[9] See SSR 83-10 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."). The Commissioner further notes that according to the Dictionary of Occupational Titles these jobs require the repetitive performance of simple, routine tasks.

Under these circumstances, it does not appear that plaintiff was harmed by the ALJ's oversight. Plaintiff contends in reply that nothing in the VE's testimony indicated that he assumed plaintiff could perform only simple, routine, repetitive work. Perhaps so, but it appears that the VE only identified jobs which fit that description. Thus, plaintiff demonstrates no harm from the absence of this assumption in the VE's responses. However, plaintiff may

_____

[9]The VE testified that these jobs had an SVP of two. (Tr. at 465-66.) "SVP" stands for "Special Vocational Preparation." "An SVP of two means that the job may require anything beyond a short demonstration up to 30 days of training to learn." Lechner, 321 F. Supp. 2d at 1021 n.3.

Case 2:07-cv-00028-LA   Filed 08/17/07   Page 23 of 27   Document 21

revisit the issue with the VE on remand.[10]

**D.    Credibility**

Finally, plaintiff argues that the ALJ improperly evaluated the credibility of his testimony. Generally, the court must defer to an ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing. Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).

However, in order to benefit from this deferential standard, the ALJ must sufficiently articulate the reasons for his credibility determination. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003) (citing SSR 96-7p). Further, the ALJ must comply with the requirements of SSR 96-7p. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).

SR 96-7p establishes a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. SSR 96-7p.

Second, if an underlying impairment that could reasonably be expected to produce the

---

[10]Plaintiff argues that the limitation to unskilled work failed to take into account the "moderate" limitations found by the SSA consultants, Drs. Rattan and Matkom. However, these doctors did not support plaintiff's claim; they found no significant limitations in fifteen of twenty areas in the mental RFC form and moderate limitations in just five. See Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002) (affirming denial of claim where consultant found that the claimant was "moderately limited" in certain areas but still able to perform low-stress, repetitive work). Further, plaintiff makes no showing that the inclusion of these limitations would have any effect on the VE's responses.

24

claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit the claimant's ability to work. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p. The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication the claimant takes; treatment other than medication; any other measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. While the ALJ need not elaborate on each of these factors when making a credibility determination, he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Windus, 345 F. Supp. 2d at 946.

In the present case, the ALJ found plaintiff's testimony "no more than partially credible." (Tr. at 18.) Plaintiff alleges that the ALJ failed to adequately explain his finding, but I disagree. In support, the ALJ noted that although plaintiff testified that he could lift only five pounds, occupational and physical therapy evaluations revealed that he could lift much more. (Tr. at 17-18.) The ALJ further noted that plaintiff engaged in various daily activities, including driving, socializing with friends, working part-time in a sandwich shop, helping his aunt manage an apartment building (which involved painting and mowing the lawn) and caring for himself.

25

Plaintiff used no prescribed medications for his muscular or psychological impairments, and reported no side effects from his cardiac medications. The ALJ also noted that plaintiff's parents had kicked him out of their house because he would not get a job, which supported an inference that he was lazy. (Tr. at 18.) The ALJ also considered the evidence of symptom magnification in the psychological testing. (Tr. at 19.)[11]

The ALJ acknowledged the requirement that he consider all of the evidence under SSR 96-7p (Tr. at 17), covered most of the SSR 96-7p factors and built a bridge from the evidence to his conclusion. He did not reject plaintiff's testimony simply because it was not fully supported by the medical evidence; instead, he found that plaintiff's allegations were greater than the record as a whole could support. Nor did he conclude that plaintiff had no limitations; rather, he adopted a severely restricted RFC, limiting plaintiff to a subset of sedentary work. (Tr. at 19.) Therefore, I find no error in evaluating credibility.[12]

---

[11]Plaintiff contends that the ALJ failed to specify what part of his testimony was less than credible. However, the ALJ specifically mentioned plaintiff's testimony regarding his strength, endurance and frequent falls. (Tr. at 17-18.) Plaintiff also argues that the ALJ did not specify what in the psychological testing led him to discount plaintiff's testimony. Although the ALJ did not quote the report, it seems plain that he referred to plaintiff's MMPI profile revealing "a naive exaggeration of symptoms" (Tr. at 411), as well as plaintiff's statement that he hoped the testing "turned up something so he could get some 'free money.'" (Tr. at 407.) Plaintiff offers an explanation for this – that his unusual MMPI responses were related to feelings of not being supported by his family and his comment about "free money" was just him being a smart aleck – but I cannot conclude that the ALJ's reliance on this evidence was unreasonable or that his resulting conclusion on credibility was patently wrong.

[12]Plaintiff argues that the Commissioner failed to respond to his credibility argument. Although not addressed under a separate section heading, the Commissioner did address this issue on page thirteen of his brief.

26

**IV. CONCLUSION**

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of August, 2007.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge